

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00213-CR

_____

DARREN JAMES RUSH, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. DC30-CR2019-0363

---

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellant Darren James Rush challenges his conviction and resulting ten-year sentence for stealing a trailer and three trucks valued between $30,000 and $150,000, a third-degree-felony offense. *See* Tex. Penal Code Ann. § 31.03(a), (e)(5). Although we agree with Rush that the trial court should have included the Texas Penal Code's definition of "value" in the jury charge, he was not egregiously harmed by its omission, nor did the evidence fail to prove that essential element. *See id.* § 31.08. And although we also agree that it's hard to see how trial counsel could justify having filed a new-trial motion that was obviously cut and pasted from a different case with wholly different facts, Rush has not shown the egregious harm needed to succeed on his ineffective-assistance issue. We will thus affirm.

## I. Background

In the early morning hours of May 2, 2018, a Wichita County manufacturing facility—Falls Concrete—was relieved of three of its work trucks and a trailer, as employee Larry Clapp discovered upon arriving for work between 4:00 and 5:00 a.m. that morning. A motion-activated security camera had captured video shortly after 1:00 a.m. of several individuals driving off with a 2014 Toyota Tacoma pickup, a 2016 GMC Sierra pickup, and a 2003 Chevrolet Silverado pickup.[1] The trailer was attached to the Sierra.

---

[1] A fourth vehicle is mentioned in the indictment, but at trial the State dropped any charges related to it.

Clapp did not recognize anyone in the video, but through GPS tracking devices on the two newer pickups, the trucks' whereabouts were quickly pinpointed as being in the Fort Worth area. After locating the Tacoma parked at an apartment complex, Fort Worth law enforcement surveilled the spot to see if anyone showed up. FWPD Officer Tom Gierling, who was working the case, then learned of the Sierra's location, and one of his teammates went to surveil that area as well. And although the trailer had been separated from the Sierra at some point, Officer Gierling was able to find it abandoned at a third location and surveilled it too, "[t]ry[ing] to catch anybody that had their hands on it, had any involvement in it."

Officer Gierling returned to the trailer's location three or four times throughout the day (May 2), finally deciding that because no activity had occurred around the two pickups or the trailer, they should just be removed from the scene(s). When Officer Gierling went to recover the trailer at around 7:00 p.m., he serendipitously "rolled up on several individuals, and there was a dark-colored SUV backed up to it, hooked up to the trailer."[2]

Of the five people there, one immediately ran off but was soon found hiding behind a trash can: Darren Rush. Rush had sold the trailer that day to one of the other people on scene for $500 or so. After being arrested, Rush directed Officer Gierling to the otherwise untrackable 2003 Silverado.

---

[2]That SUV was not one of the stolen vehicles.

A grand jury indicted Rush for theft of property having a value greater than $30,000 but less than $150,000. *See id.* § 31.03(a), (e)(5). A jury convicted Rush of that charge, and the trial court imposed a ten-year prison sentence. Rush appealed.

## II. Issues

On appeal, Rush asserts the following, in five issues:

1. The trial court erred in allowing Clapp to authenticate, and thus in admitting into evidence, a CPA-prepared document—State's Exhibit 3—that was the sole evidence of value.[3]

2. The trial court erred by not including the statutory definition of "value" in the jury charge, an omission that was egregiously harmful.

3. Considering the evidence in light of the hypothetically correct jury charge, which would have defined "value" as "fair market value," the evidence was insufficient to support the verdict.

4. Trial counsel was constitutionally ineffective by filing a new-trial motion that was obviously cribbed from an altogether different case and mentioned facts and legal arguments having nothing to do with Rush's case.

---

[3]At oral argument, Rush's appellate counsel candidly conceded that Rush waived this issue by not also objecting when Clapp testified about the contents of that exhibit, so we will overrule issue one without discussion. *See Walker v. State*, No. 02-16-00418-CR, 2018 WL 1096060, at *4 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op., not designated for publication) (holding that appellant forfeited objections to toxicology report because he objected only to its admission and not to testimony describing its contents, and reminding that "[u]nobjected-to testimony about objected-to evidence results in forfeiture of the objection").

5. Trial counsel was constitutionally ineffective by not objecting to State's Exhibit 3 on Confrontation Clause grounds.[4]

### III. Issues Two and Three
*(Jury charge; evidentiary sufficiency)*

**A. Scope of review**

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19. The appropriate inquiry for egregious harm is fact- and case-specific. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

In making an egregious-harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of

---

[4]At oral argument, Rush conceded that direct appeal is not the appropriate vehicle within which to raise this ineffectiveness argument, and we agree. *See Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (holding that an appellate court cannot infer ineffective assistance from a record silent about counsel's decisions). As with Rush's first issue, then, we need not analyze his fifth one.

counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174. Egregious harm is a "high and difficult standard" to meet. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of

6

proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

**B. Discussion**

In this case the charge given to the jury, the hypothetically correct charge, and the evidence on value warrant discussing Rush's second and third issues together. *Cf. Phillips v. State*, No. 02-16-00049-CR, 2016 WL 6519118, at *2 (Tex. App.—Fort Worth Nov. 3, 2016, no pet.) (mem. op., not designated for publication) (addressing interrelated issues together). The result, on these facts and under applicable law, is that we must affirm.

**1. Charging the jury on and proving value**

Penal Code Section 31.08(a) defines "value"—an essential element of a theft charge, as it drives the applicable offense level—as "the fair market value of the property . . . at the time and place of the offense," or, "if the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the theft." Tex. Penal Code Ann. § 31.08(a). The Penal Code does not

define fair market value, but it has long been judicially recognized to mean "the amount the property would sell for in cash if offered for sale by a willing seller to a willing buyer, given a reasonable time for selling it." *Mangum v. State*, No. 02-15-00063-CR, 2016 WL 1072134, at *4 (Tex. App.—Fort Worth Mar. 17, 2016, no pet.) (mem. op., not designated for publication) (citing *Keeton v. State*, 803 S.W.2d 304, 305 (Tex. Crim. App. 1991)); *see also Keeton*, 803 S.W.2d at 306–07 (Clinton, J., concurring).

The State concedes that the trial court should have given the jury this definition. But no harm, no foul, the State urges, pointing to the common understanding of "value" generally as the equivalent of "fair market value" when an owner[5] testifies to it, and to cases in which omitting the definition of fair market value was not egregiously harmful. We start with those cases.

The first is *Landrum v. State*, 590 S.W.3d 640 (Tex. App.—Waco 2019, pet. ref'd). There, the owner "testified as to the fair market value of the property stolen by estimating the purchase price for each item[,] as he was permitted to do." *Id.* at 646 (citing *Sullivan v. State*, 701 S.W.2d 905, 909 (Tex. Crim. App. 1986) (holding that an owner "may testify as to his or her opinion or estimate of the value of the property in general and commonly understood terms" and noting that an owner "may reasonably be understood to be testifying as to the fair market value of the property

---

[5]The Penal Code defines "owner" as one who has "possession of the property" or "a greater right to possession of the property than the actor." Tex. Penal Code Ann. § 1.07(a)(35)(A).

either in terms of the purchase price or the cost to him of replacing the stolen property")). Because the charge in *Landrum* otherwise adequately described the offense and included all the elements of theft, and because "nothing in the record indicate[d] that the lack of a definition would have confused the jury or caused the jury to misapply the law," *id.* (cleaned up), Landrum had not been egregiously harmed.

The State also cites *Bullock v. State*, 479 S.W.3d 422 (Tex. App.—Houston [14th Dist.] 2015), *rev'd on other grounds*, 509 S.W.3d 921 (Tex. Crim. App. 2016). In that theft case—another in which the charge did not define "value"—the manager of a furniture-rental company opined that a leased delivery truck had a value of $83,000 when it was stolen. *Id.* at 425. The manager testified that he knew the value because "[t]he information was provided by Penske Rental Trucks," which had sent his company an email showing the value. *Id.* at 425–26. The appellate court summed up the evidence:

> [The manager] testified that his company leased new trucks every five years, leading to the rational inference that the truck in question was less than five years old at the time of the theft. . . .
>
> Further, [the manager] testified that the value of the truck itself was $83,000, not what it "cost" the company. That is, [the manager] did not testify about the "lease value" or whatever amount the company paid to lease the truck. That type of testimony might not have been evidence of fair market value . . . . But [the manager]'s testimony about value was clear and unequivocal, and appellant did not offer any "controverting evidence as to the value of the stolen item," which was necessary to rebut the property-owner presumption. *See Sullivan*, 701 S.W.2d at 909; *Smiles* [*v. State*], 298 S.W.3d [716,] 719 [(Tex. App.— Houston [14th Dist.] 2009, no pet.)].

9

*Bullock*, 479 S.W.3d at 427–28.

As for the jury charge, Bullock was not egregiously harmed by its failure to define value: the charge adequately described the offense and included all elements of theft; the record did not show that the jury would have been confused by not having the definition; the commonly understood meaning of "value" closely resembles the applicable statutory definition; and Bullock offered no competing evidence about the truck's value. *Id.* at 428–29.

An owner's proof of value need not be particularly robust, much less balance-sheet-perfect; such proof need not even explicitly take depreciation into account. *Id.* at 427 ("Although [the manager] did not provide an opinion about depreciation, such evidence is not always required." (citing *MaGee v. State*, 715 S.W.2d 838, 839–40 (Tex. App.—Houston [14th Dist.] 1986, no pet.))). Indeed, "[t]here is no requirement in *Sullivan* that the State must ask questions of the owner of stolen property in specific terms of 'value.'" *Landrum*, 590 S.W.3d at 644.

In *Sullivan* itself, the owner testified only that his stolen gun was worth $500 "at least" and that $500 was what he would "take for it," despite the owner's initially testifying that he had no idea what the gun's "price" would have been when it was stolen and conceding also that he did not know the gun's "market value" or what it would sell for "out in the street"; that testimony was held sufficient. 701 S.W.2d at 907, 909–10; *see Campbell v. State*, 426 S.W.3d 780, 785 (Tex. Crim. App. 2014) ("[W]e presume that an owner's testimony estimating the value of his property is either

10

estimating the purchase price of the property or the cost to replace the property in terms of the fair market value, even though the owner may not use the specific terms 'market value,' 'replacement value,' or 'purchase price.'").

## 2. Clapp's testimony and Exhibit 3

Clapp testified that when stolen in May 2018, the 2014 Toyota Tacoma was in "[e]xcellent condition," the 2016 GMC Sierra was "virtually new," and the 2003 Chevy pickup was in "fair to good" condition, with "some miles on it," although he did not recall the vehicles' mileage. From Clapp's testimony, it appears that only the Sierra came back damaged.[6] As for the trailer, Clapp did not independently recall the brand or the year but knew that it had been returned undamaged after the theft.

The trial court admitted into evidence State's Exhibit 3, a chart of the four stolen items:

---

[6]Falls Concrete sold the unrepaired Sierra in 2020 for around $14,000, an amount that Clapp said reflected "[q]uite a bit" of loss in value because of its damaged state. The Sierra's value when sold in 2020 does not of course bear upon its value when it was stolen in 2018.

FALLS CONCRETE, LLC (TITLES IN NAME OF NORTHWEST MATERIALS, LLC LEASED TO FALLS CONCRETE, LLC)

| VEHICLE DESCRIPTION | VIN# | DATE PURCHASED | PURCHASED AMOUNT | DATE SOLD | SOLD AMOUNT | APRIL 2018 |
|---|---|---|---|---|---|---|
| 2014 TOYOTA TACOMA PICKUP (PUR. FROM JOE COOPER TOYOTA) | 5TFNX4CN3EX040507 | 5/28/2014 | $ 23,909.44 | | | $ 11,752.00 |
| 2016 GMC SIERRA 3500 PICKUP (PUR. FROM PATTERSON'S) | 1GT41VCG4GF165755 | 5/19/2016 | $ 41,906.92 | 6/15/2020 | $ 13,986.14 | $ 26,906.92 |
| 2003 CHEVROLET 1/2T PICKUP (PUR. FROM HERB EASLEY CHEV.) | 1GCEC14T93Z117020 | 8/26/2002 | $ 23,108.80 | | | $ 4,321.00 |
| 2016 BIG TEX UT TRAILER (PUR. FROM BIG TEX TRAILERS) | 16VNX1629G2071054 | 5/10/2016 | $ 4,638.00 | | | $ 3,386.00 |
| | | | | | TOTAL | $ 46,365.92 |

Clapp testified that Falls Concrete's accounting firm tracks its assets' values over time, that its "tax documents" are maintained as a business record in the ordinary course of business, and that its CPA generates such records "at or near the time of the yearly tax preparation." Asked if he received Exhibit 3 "from the CPA that actually handles your records," Clapp responded, "I couldn't say, sir. I went to the owner of the company, and she put together this information for me to bring it to court this morning." Clapp further agreed that he did not handle that type of information, nor could he "verify or talk to the veracity of . . . the numbers." Clapp also said that his testimony concerned "depreciated value," something that he acknowledged could depend on several things but that were beyond his "level of expertise."

### 3. Analysis

To put our analysis in its fullest context, we initially address Rush's argument, made in connection with his first (waived) issue, that Clapp was a "non-owner" of the property who "must be qualified as to his knowledge of the value of the property and

12

must give testimony explicitly as to the fair market value or replacement value of the property." *Sullivan*, 701 S.W.2d at 909. We disagree with this characterization because Clapp, as Falls Concrete's equipment facilitator, had "possession of the property" or "a greater right to possession" than Rush, and thus Clapp was its owner. *See* Tex. Penal Code Ann. § 1.07(a)(35)(A) (defining "owner"). Under Texas law, an owner can opine on fair market value without needing any particular expertise. *See Sullivan*, 701 S.W.2d at 909 ("When an owner testifies, the presumption must be . . . that the owner is testifying to an estimation of the fair market value."); *Landrum*, 590 S.W.3d at 646 (same). And negating property-owner opinion testimony requires more on the defense's part than "merely impeach[ing] the witness' credibility during cross-examination. He must offer controverting evidence as to the value of the property." *Sullivan*, 701 S.W.2d at 909.

Rush did not offer such evidence at trial. On appeal, he argues that (1) because the jury charge did not define "value," (2) because of a disconnect between "April 2018" values and the May 2, 2018 theft—a timespan that could have been long enough to make the April numbers unreliable—and (3) because the evidence of value was untethered from fair market value, the jury was left to improperly speculate that Rush had stolen property with a collective fair market value exceeding $30,000. *See Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007) ("[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.").

As for the jury-charge argument, Rush has not pointed us to, and we have not found, any Texas case in which a defendant on trial for theft was egregiously harmed because "value" was not defined. To the contrary, courts routinely reject such an argument where (1) the charge adequately describes the offense and includes all elements of theft; (2) the record does not show that the jury would have been confused by not having the definition; (3) the commonly understood meaning of "value" closely resembles the applicable statutory definition; and (4) a defendant offers no competing evidence about value. *See, e.g., Landrum*, 590 S.W.3d at 646–47; *Bullock*, 479 S.W.3d at 428–29.

Here, Rush has not assailed any other aspect of the charge, which tracked the offense's elements and instructed the jury accordingly. *See* Tex. Penal Code Ann. § 31.03. Rather, he essentially argues that the *Bullock* court got it wrong because we ostensibly can't know if the jury had in mind replacement value, sentimental value, production value, commercial value, or fair market value, thus rendering useless *Bullock*'s observation that the dictionary definition of "value" closely resembles fair market value.

But not only does caselaw instruct us to presume that an owner's opinion on value means fair market value, we think the record here goes further. It refutes Rush's attempt to imply confusion or improper jury speculation about the type of value at

14

hand: although Clapp did not create Exhibit 3,[7] he explained that the CPA provided such "tax documents" in connection with Falls Concrete's asset values, and later agreed that he was referring to "depreciated value"—a concept within the common knowledge of any juror who has ever bought or sold a car. *See Depreciation*, Black's Law Dictionary 534 (10th ed. 2014) ("A reduction in the value or price of something; specif., a decline in an asset's value because of use, wear, obsolescence, or age."); *cf., e.g.*, *McCandless v. Pease*, 465 P.3d 1104, 1115 (Idaho 2020) ("[I]t is within the common knowledge and experience possessed by most jurors that a new vehicle would have depreciated considerably over a period of six years."); *Ctr. Garage Co. v. Columbia Ins. Co.*, 115 A. 401, 403 (N.J. 1921) ("[It] is common knowledge that the value of a car depreciates with use, ordinarily, and, although common knowledge can hardly be used as a substitute for proof, yet, on the other hand, there is no presumption existing against it.").

Additionally, although no Texas case seems to have come out and said so directly, depreciated value logically reflects fair market value in a theft prosecution. *Cf. Newsom v. State*, No. 03-21-00694-CR, 2022 WL 3649625, at *4 & n.2 (Tex. App.— Austin Aug. 25, 2022, no pet.) (mem. op., not designated for publication) (reversing criminal-mischief conviction for destroying a tire of certain alleged minimum fair

---

[7]Although Rush did not lodge a hearsay objection to Exhibit 3, the court of criminal appeals "has consistently held that hearsay evidence is admissible as proof of market value." *Gonzales v. State*, 478 S.W.2d 522, 524 (Tex. Crim. App. 1972).

market value where State proved only replacement value, and noting there was "no evidence of how to calculate the depreciation of tires, thus there is no evidence of the fair market value of the tire when destroyed"; "[e]ven if the jury could use its common knowledge to calculate a linear rate of depreciation of value based on the use of the first set of tires on the vehicle, the replacement cost does not provide legally sufficient evidence to support a depreciated fair market value of at least $100"). And such publications as the Kelly Blue Book, which provides fair-market-value estimates based on mileage and condition of a given year, make, and model of vehicle—the *sine qua non* of depreciated value—are a recognized means of establishing value in a theft case. *See Crouch v. State*, No. 05-15-00858-CR, 2016 WL 7163859, at \*3 (Tex. App.—Dallas Dec. 1, 2016, no pet.) (mem. op., not designated for publication) ("Here, Stratton, the owner, testified that the BMW's blue book value was $24,500, which value he reported to the police. This testimony was sufficient to establish value, and speculation on cross-examination about whether CarMax may have purchased the BMW for less does not render the evidence insufficient.").

More fundamentally, even without Exhibit 3 and any talk of depreciation, Clapp could simply have voiced his opinion about the property's value—a value presumptively equal to fair market value because he was the owner—and sharp cross-examination about that opinion would not have destroyed the State's case. *See Sullivan*, 701 S.W.2d at 909 (holding that cross-examining owner's value opinion is not enough; defense must offer controverting evidence).

For all these reasons, we conclude that Rush was not egregiously harmed by the charge's failure to define value and that the evidence, viewed in the light most favorable to the verdict, sufficed to establish Rush's guilt beyond a reasonable doubt when compared with the hypothetically correct charge. *See Jenkins*, 493 S.W.3d at 599. We overrule Rush's second and third issues.

## IV. Issue Four
### *(Ineffective assistance of counsel at motion-for-new-trial stage)*

### A. Applicable law

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See*

17

*Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.

Ineffective-assistance claims are usually best addressed by a postconviction writ of habeas corpus because the record generally is more developed, particularly regarding counsel's strategic decisions. *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011); *see Thompson*, 9 S.W.3d at 814 & n.6; *Ex parte Torres*, 943 S.W.2d 469, 475–76 (Tex. Crim. App. 1997).

**B. The boilerplate—and inaccurate—new-trial motion filed here**

After the trial court entered its judgment of conviction and sentenced Rush to ten years' imprisonment, his trial counsel timely filed a motion for new trial. The motion clearly involved a different case, stating:

> The findings and conclusions of the Court in this cause are contrary to the law and evidence.
>
> The evidence is insufficient . . . to support a preponderance-of-the-evidence standard relating to the violations of the deferred adjudication order and the subsequent judgment and sentence in this cause.

18

The interest of justice requires that the Court grant a new trial in this cause.

The evidence relevant to the underlying plea of guilty does not legally and factually to [sic] support the judgment and sentence in this cause and is insufficient in that the original judicial confession in this cause does not provide evidentiary support for the subsequent adjudication of this cause because at the time of the alleged offense the alleged victim was not a student and the defendant was not a substitute teacher for Iowa Park School District. [Internal numerical headings omitted.]

**C. Analysis**

Rush's fourth issue does not complain of his counsel's actions during either the guilt–innocence or the punishment phase of his trial. And, "a defendant generally need not file a motion for new trial to preserve issues for appeal," *Cooks v. State*, 240 S.W.3d 906, 910 (Tex. Crim. App. 2007), although Rush's counsel did file such a motion (sort of), thus extending the appellate deadlines if nothing else. *See Walsh v. State*, No. 05-19-00710-CR, 2021 WL 3438069, at *5 (Tex. App.—Dallas Aug. 5, 2021, no pet.) (mem. op., not designated for publication) (rejecting argument that trial counsel was ineffective for filing pro forma new-trial motion and noting that "by filing the motion for new trial, counsel, at a minimum, extended the appellate timetable").

*Walsh* involved a barebones motion that argued for a new trial "'for the good and sufficient reason that the verdict is contrary to the law and evidence,'" with no elaboration. *Id.* at *3. Declining to hold that this generic filing showed constitutionally ineffective assistance, the court of appeals observed that the appellant had "provide[d]

19

this Court with no authorities supporting his contention that filing a pro forma motion for new trial falls below an objective standard of reasonableness, and we have found none." *Id.*

Similarly, we have found no case holding that a misfiled, or cut-and-pasted, or error-ridden motion for new trial "falls below an objective standard of reasonableness," although such a motion is sloppy at best. But even if we assume that the new-trial motion here satisfies *Strickland*'s deficient-performance prong, that does not end our inquiry. Rush must also show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

Regarding that different-result prong, Rush posits two arguments that effective counsel would have raised in a new-trial motion: first, that the jury charge's failure to define "value" meant that "the court ha[d] misdirected the jury about the law," *see* Tex. R. App. P. 21.3(b) (providing that a criminal defendant "must" receive a new trial "when the court has misdirected the jury about the law"), thereby affording Rush an additional appellate point if the trial court had abused its discretion by not giving him a new trial; and second, that "the evidence did not support the verdict because the valuation of the stolen property was not established."

The court of criminal appeals has held that charge error raised in a motion for new trial is reviewed for *Almanza* egregious harm, not for abuse of discretion. *Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006) ("If appellant were correct,

defendants would no longer be required to preserve a jury-charge error at trial so long as the issue was raised in a motion for new trial because *any* error in the charge could be said to 'misdirect' the jury. That result contradicts the policy of encouraging the timely correction of errors, which is embodied both in Article 36.19 and in our own rules of appellate procedure."); *see also State v. Ambrose*, 487 S.W.3d 587, 594 (Tex. Crim. App. 2016) ("*Almanza* is the appropriate standard for conducting a harm analysis in cases reviewing jury-charge error, even when the error was first asserted in a motion for a new trial."). Thus, even if Rush's trial counsel had filed a thorough new-trial motion that included his jury-charge argument, we would be reviewing this issue under the same standard—egregious harm—as we have already done in connection with Rush's second issue.

Likewise, Rush cannot show that his case would have turned out differently if only his trial counsel had raised evidentiary insufficiency in a new-trial motion, because we have considered the evidence ourselves and held it sufficient to support his conviction.

Because a defective new-trial motion (or even the complete absence of one) did not hamper and could not have hampered Rush in presenting the issues he has identified on appeal, reviewed as they are under the same standards the trial court would have applied, we cannot say that he received constitutionally ineffective assistance of counsel. We overrule Rush's fourth issue.

## V. Conclusion

Having overruled Rush's issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr

Elizabeth Kerr

Justice

Do Not Publish

Tex. R. App. P. 47.2(b)

Delivered:  March 9, 2023